In the Matter of John McCandish KING,
Debtor-Appellee-Cross-Appellant,

v.

UNITED STATES of America,
Appellant-Cross-Appellee.

Nos. 75–1303, 75–1304.

United States Court of Appeals,
Tenth Circuit.

Submitted May 17, 1976.
Decided Nov. 19, 1976.

Stanton D. Rosenbaum (Barry J. Goldstein, Denver, Colo., on the brief), of Isaacson, Rosenbaum, Spiegleman & Friedman, Denver, Colo., for debtor-appellee-cross-appellant.

Joseph L. Liegl, Dept. of Justice, Washington, D.C. (Scott P. Crampton, Asst. Atty. Gen., and Gilbert E. Andrews, Jr., and Karl Schmeidler, Dept. of Justice, Washington, D.C., on the brief), James L. Treece, U.S. Atty., Denver, Colo., of counsel, for appellant-cross-appellee.

Before BARRETT and DOYLE, Circuit Judges, and TEMPLAR *, District Judge.

BARRETT, Circuit Judge.

The respective parties cross-appeal from the district court's findings of fact, conclusions of law and order of January 28, 1975, relating to a determination of the amount and the validity of taxes assessed by the United States through the Internal Revenue Service (IRS) against John McCandish King (King) and the liens filed pursuant to the assessments, in proceedings for an ar-

* Of the District of Kansas, sitting by designation.

rangement under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701, et seq. Jurisdiction on appeal vests by virtue of 11 U.S.C.A. § 47(a).

The court, with the approval of the parties, divided the two primary issues determined for separate hearings, captioned, respectively, Phase One (heard March 4, 1974 through March 13, 1974) and Phase Two (heard July 15, 1974 through July 18, 1974).

### General Factual Background

King first engaged in the oil business in 1955 when he organized the Fox-King Company. Shortly thereafter, King and a Mr. Stevenson formed an oil company which proved to be very successful in the Midwest and Rocky Mountain areas. After their relationship terminated, King organized King Resources Company to engage in the oil business. The company went public in 1967. It then issued stock and convertible debentures through an underwriter. From 1967 through 1970, King Resources appreciated a phenomenal success. Its exploration activities became widespread after King organized two Delaware corporations, Imperial-American Resources Fund, Inc., and Royal Resources Exploration, Inc., to raise public investment funds for drilling activities to be undertaken for the most part by King Resources Company. *Imperial* was to be the sole general partner in a series of limited partnerships which acquired the beneficial ownership of proven or semi-proven oil and gas properties. *Royal* was to become the general partner in a series of limited partnerships which acquired beneficial ownership of wildcat oil and gas properties.

The stock of *Imperial* was issued to Imperial-American Management Company, a Delaware corporation, which held title to the Fund properties on behalf of the limited partnerships. It managed the affairs of the partnerships for a 25% "net operating profits interest" in each oil and gas lease or other property of the partnerships. All of the certificates of stock of *Imperial-American* were issued to John M. King and his wife, Carylyn, and to trusts for their children, described and designated by the trial court as Trusts No. 1.

The stock of Royal Resources Exploration, Inc., was issued to Royal Resources Company, a Delaware corporation owned by John and Carylyn King, and Trusts No. 1. The relationship between these two companies was the same as that between the *Imperial* companies.

In November of 1968, the Kings and Trusts No. 1 exchanged their stock in *Imperial-American Management* and *Royal Resources Exploration* for stock in a new corporation known as The Colorado Corporation. In addition to being a holding company, *Colorado* also engaged in the acquisition, sale and development of oil, gas and mineral properties. *Colorado* also owned the stock of The Denver Corporation, a broker-dealer for the sale of participating interests in the *Royal* and *Imperial* limited partnerships as securities offered via SEC registrations.

King participated in the investment made by the *Royal* and *Imperial* partnerships through some joint venture funds parallel to but separate from the limited partnerships.

While each of the aforementioned companies had separate officers and directors, King was at all times active in their management affairs. He was particularly involved in the area of financing. The operations of the complex were elaborate, aggressive and broad-ranging throughout the world. The operation was on a streamlined, computerized program. The various corporations employed many persons. The complex was, in large measure, reflective of the aggressive, outgoing and fast-moving style and manner of King.

Largely because of the tempo set by King, it was the usual for accounting and legal documentations of the corporate activities to "tag behind" the day-to-day occurrences. The fast-moving routine required the preparation of documents for execution on an earlier designated date than their actual execution or approval.

At the same time that the King companies were expanding so dramatically, a complex of companies referred to hereafter as the IOS Group, led by Bernard Cornfield and Edward Cowett, obtained tremendous sums of investment moneys in what came to be known as offshore mutual funds. This group was organized in a manner so as to do business while avoiding government regulations, such as the securities laws of the United States. The IOS mutual funds sought out investment opportunities and IOS became the King companies' largest customer for sale of oil, gas, and mineral investments.

In the Spring of 1970, the IOS structure commenced to encounter problems, including an internal struggle. Concurrently, the stock market incurred a drastic downswing. This resulted in substantial restraint on the part of investors and, in fact, it generated redemptions by many investors.

Upon invitation by Mr. Cornfield, King undertook, through King Resources Company, an extensive computerized analysis of IOS in relation to Cornfield's recommendation to King to attempt to form a consortium to acquire control of IOS. These efforts did not succeed. Thereafter, the King companies incurred financial pressures which led to the bankruptcy proceedings.

An involuntary proceeding in bankruptcy was filed against The Colorado Corporation on April 20, 1971, and, after a long contest, it was adjudicated bankrupt in 1974. John M. King filed a petition under Chapter XI on June 1, 1971. An involuntary petition was filed against King Resources Company on August 14, 1971, and on February 25, 1972, Imperial-American Resources Fund, Inc. filed for reorganization.

The total jeopardy assessments involved in the instant proceedings, made May 1, 1971, and May 31, 1972, amount to about $18,000,000.00. By agreement of the parties, the district court reserved determination of the exact computations of any such taxes for future proceedings, dependent upon resolution of the issues presented on this appeal, which were treated by the district court in distinct categories. We shall proceed with our review in the manner the IRS presents the issues on appeal, together with the separate issue involved in the cross-appeal.

### I.

*Whether a clause in an agreement for the sale of the debtor's corporate stock to his children's trusts requiring a price adjustment in the event the Internal Revenue Service determined the stock was sold for less than its fair market value may be enforced to defeat a gift tax assessed under § 2512(b) of the Code.*

The IRS contends that the amount of the tax is the difference between its then market value and the value of the consideration received.

In 1967, King appointed his attorney, Timothy Lowry, as trustee for separate trusts he then created for each of his four children. These trusts were designated and referred to at trial as Trusts No. 1. They were intended to exist for the full period of time permitted by the rule against perpetuities, for the benefit of King's children, grandchildren and even great grandchildren. Of course, under these circumstances, the trusts provided for distribution restrictions to King's children. A Denver attorney, James Bye, was contacted by King in October of 1969, and was asked to prepare some documents reflecting recent sales King had made of stock he held in The Colorado Corporation to Timothy Lowry, as trustee of Trusts No. 1. Bye obtained confirmation from Mr. Lowry that such a transaction had taken place. Thereafter, Lowry prepared drafts of the documents dated as of January 1, 1969. Four letter agreements were prepared bearing that date and executed by King and Lowry after October of 1969, one for each of King's four children. Each provides that King is to retain title to the stock as security for payment of the purchase price and each contains this language:

". . . However, if the fair market value of The Colorado Corporation stock as of the date of this letter is ever determined by the Internal Revenue Service to

be greater or less than the fair market value determined in the same manner described above, the purchase price shall be adjusted to the fair market value determined by the Internal Revenue Service."

Attached to each of the four letters was a formal "Declaration of Trust" executed by Lowry who acknowledged that he would execute formal trust agreements. This he did, following the October 1969 discussions. The formal trust agreements, prepared by Mr. Bye, were also dated January 1, 1969. The property granted in each trust agreement·was the 400 shares of King's stock in The Colorado Corporation.

The valuation formula employed for the shares sold by King to the trusts was identical to the valuation plan used for a qualified stock option plan of The Colorado Corporation. Under that formula, each share was valued at $1250.00. The four trusts executed notes for $2,000,000.00. Later, as a result of a 1000 for 1 stock split, the total shares transferred were 1,600,000 at a value of $1.25 per share.

At a later date, Bye inserted a provision in the trust agreements for a redetermination of the purchase price because of the uncertainty of the value of The Colorado Corporation stock in light of the fact that it was a closely held corporation and few sales of its stock had been made.

The district court found that King created the four Trusts No. 1 on October 20, 1969; that the shares of his stock held in The Colorado Corporation were transferred to the trusts in exchange for the promissory notes on that same date; and that there was an intention to cause the trusts to pay full and fair consideration for the stock and to make an actual adjustment of the price paid upon the event of a determination by the IRS.

The district court relied upon G. Bogert, Trusts and Trustees, § 41 et seq. (2d Ed.), and Scott, Abridgement of the Law of Trusts, § 23 at 66 (1960) for the rules that essential elements for creation of a trust involve the settlor's intent to create the trust, an identifiable trust res, a trustee,

identifiable beneficiaries and an objective manifestation of intent to create the trust. The court found that King and Bye participated in the formulation in January, 1969, and that the first manifestation of the intent to create the trust was that shown by affirmation made by Mr. Bye (on behalf of King) to Mr. Lowry after King had requested that Bye prepare the documents. Further, the court found that on October 20, 1969, the trusts were created and that on that date the stock was transferred and the documents executed. The court held that the so-called "price adjustment clause" insulated the transfers from gift tax.

The agreed price was later computed at $1.25 per share. The IRS, however, determined the stock had a fair market value of $16.00 per share at the date of transfer and assessed a gift tax against King for the difference. The court, of course, rejected the IRS view, finding that it was intended that the trusts pay the fair market value of the stock and that the price-adjustment clause overcame the difficulty of determining its fair market value. IRS contends that this finding is clearly erroneous, and that the sole issue is whether the price adjustment clause in the sale agreements may be given effect to alter the terms of a completed transfer and thus avoid a gift tax. IRS relies substantially upon *Commissioner v. Procter*, 142 F.2d 824 (4th Cir. 1944), cert. denied 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 606 (1944) which held that when the taxpayer there transferred certain property to a trust he had previously established (retaining the income therefrom during his lifetime with the remainder of the trust property to be distributed to his children upon his death) the price adjustment clause contained therein was void as against public policy. The trust agreement provided that if a federal court should ever rule that any portion of the trust res was subject to gift tax, the taxable portion of the transfer would automatically revest in the taxpayer as if the conveyance in trust had not been made. The court held that the transfer was a completed gift of the remainder to the children and that it was contrary to public policy to enforce the

"savings clause" to avoid the tax on a completed gift.

The district court distinguished the facts in the case at bar from those in *Procter, supra,* finding that the parties intended that the trusts pay a full and adequate consideration for the stock and that the clause was a proper means of overcoming the uncertainty in ascertaining the fair market value of the stock. The court concluded that there was an intention to cause the trusts to pay full and fair consideration for the stock and to make an actual adjustment of the price paid upon the event of a determination by the IRS. We agree. It is important to observe that the IRS does not dispute the contention that it was difficult, if not impossible, to accurately value the stock at the time of its transfer in 1969 and that the parties inserted the specific valuation paragraph in the agreement because the transaction was intended as a sale and not as a gift. The trial court's determination was one of fact. That finding is not clearly erroneous.

We believe that the IRS reliance on *Procter, supra,* is misplaced. Here, there was at no time or in any way an attempt to alter or negate the plain terms of the valuation clause and no attempt by the trustees was made to reconvey the stock to King or to cancel the notes in anticipation of an unfavorable valuation ruling.

Authorities relied upon by the Government dealing with contingencies which, upon fruition, alter, change or destroy the *nature* of the transaction do not apply here. The proviso for adjustment of the purchase price of the stock to equal its fair market value did not affect the *nature* of the transaction. But, argues the IRS, even though the parties may have intended to pay full consideration for the stock, still this fact is immaterial for gift tax purposes because the test is solely objective, i. e., whether the transfer was made for full and adequate consideration. In a nutshell, IRS contends that if King's intent to make a sale would not be sufficient to prevent the gift tax were the price adjustment clause absent, "that intent obviously cannot be used to legitimate the presence of the clause so as to avoid the tax". [Br. of Appellant, p. 16]. Treasury regulations, references and citations are relied upon. The IRS presents persuasive arguments, based upon its rules that (a) for accounting purposes, absent specific statutory language to the contrary, tax consequences attach at the end of fixed and regular accounting periods, regardless how subsequent events might affect the economic or tax results of the transaction, (b) taxpayers cannot amend a transaction retroactively to avoid the federal tax consequences of prior taxable periods and (c) the difficulty of valuing the property transferred does not make the gift tax inapplicable. IRS further contends that the record does not show an attempt by the parties at the time of suit to make an actual price adjustment and the gift tax would be virtually emasculated if the parties' intention to effect a transfer for a full consideration were enough to satisfy the requirements of 26 U.S.C.A. § 2512(b) of the Internal Revenue Code of 1954.

The trial court's finding that there was no donative intent and that the transaction was made in the ordinary course of business at arms length is not clearly erroneous. Further, it does not work an abuse upon the operative intent of § 2512, *supra,* i. e., to reach donative transfers and to exclude transfers whose consideration is not reducible to money or moneys worth. The transfers involved here can be ultimately reduced to moneys worth and are, accordingly, excluded from the gift tax consequences. No diminution of King's estate can result from the trial court's finding.

The statutory framework underlying the federal gift tax scheme is clear on its face. § 2501 imposes a tax on the transfer of property by gift. § 2512(a) provides that if the gift made is in property, the value thereof at the date of the gift shall be considered the amount of the gift. In the case of a holding company such as The Colorado Corporation, gifts of its shares of stock are governed by Treas.Reg. § 25.-2512–2 (26 C.F.R.) which provides general guidance for valuing the shares of stock

based on bid and asked prices, where selling prices and bid and asked prices are not available for dates both before and after date of gifts, where selling prices or bid and asked prices do not represent fair market value and where selling prices or bid and asked prices are unavailable. Treas.Reg. § 25.2512(1)(1968) is the general valuation rule. It provides that "the value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts".

 We are cognizant of the rule that in reviewing a challenged regulation, the regulation must be sustained if found to be reasonable and consistent with the statute. *Commissioner of Internal Revenue v. South Texas Lumber Co.,* 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948). We are also aware of the rule that where there is a possibility that several methods of valuation are permissible, any one chosen by the IRS may not be set aside. *DuPont's Estate v. Commissioner of Internal Revenue,* 233 F.2d 210 (3rd Cir. 1956), cert. denied 352 U.S. 878, 77 S.Ct. 100, 1 L.Ed.2d 79 (1956).

The IRS contention that the price adjustment clause violates public policy in that it deters administrative enforcement of the gift tax provisions is valid *only* if the transaction be construed as an inter vivos transfer undertaken to reduce King's estate. The IRS argument would be applicable if we were to hold that the trial court's finding that King intended that the trust pay full and adequate consideration predicated upon the price-adjustment proviso is clearly erroneous. It is not. Under the facts found, King is not subject to the gift tax under Treas.Reg. § 25.2512–8 because the transaction was made in the ordinary course of business at arm's length, free from any donative intent. We hold that the trial court did not err in holding that the aforesaid stock transfers are not subject to a gift tax.

To be sure, it has been held that the absence of a donative intent will not alone prevent a transfer from being subject to gift taxation, but this is not the controlling factor when the transfer has been found to have been made "at arm's length in the ordinary course of business". *Commissioner of Internal Revenue v. Wemyss,* 324 U.S. 303, 307, 65 S.Ct. 652, 654, 89 L.Ed. 958 (1945). *See also* 156 A.L.R. 1022. Interpretive of the Code requirements of "an adequate and full consideration in money or money's worth" the Supreme Court has held that the return must be an adequate and full equivalent and that the requisite consideration cannot be equated with mutual promises satisfying common law consideration sufficient to support an agreement. *Taft v. Commissioner,* 304 U.S. 351, 58 S.Ct. 891, 82 L.Ed. 1393 (1938); 116 A.L.R. 346.

Significantly, we believe, is the fact that perhaps the main purpose of the gift tax was to prevent or compensate for the avoidance of death taxes by taxing the gifts of property inter vivos which, but for the gifts, would be subject in its original or converted form to the tax laid upon transfers at death. *Sanford's Estate v. Commissioner,* 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20 (1939). No such risk is involved in the instant case.

We hold that the trial court did not err in finding that the stock sold to Trusts No. 1 under the "price adjustment" proviso is not subject to the gift tax provisions.

## II.

*Whether the district court erroneously decided that the debtor was entitled to a deduction under Section 165(c)(2) of the 1954 Code for losses sustained as a result of the abandonment or worthlessness of oil and gas leases in which he held a net operating profits interest.*

This issue deals with an ordinary loss deduction of $4,543,822 taken by King and his wife on their 1969 joint income tax return. The deduction is based on losses resulting from King's investment in net operating profits interests (NOPI) in various leases which were abandoned or determined to be worthless in 1969.

NOPI was a nonparticipating interest in an oil and gas lease. The holder of such interest was entitled to 25% of the revenue from the producing property under lease after deduction of certain operating expenses. The tax consequences of NOPI were these: (1) the proceeds were entitled to the advantages of the oil depletion allowance, and (2) an ordinary loss deduction could be taken if the underlying lease was abandoned or determined to be worthless.

NOPIs were initially utilized as compensation to Imperial-American Management Company and Royal Resources Company for management services which they provided for Imperial-American Resources Fund, Inc. and Royal Resources Exploration, Inc. Their services related to the management of the oil and gas properties held by the latter companies.

It was subsequently determined that the favorable tax treatment of NOPIs would render them attractive to Investors Overseas Services, Limited (IOS). King proceeded to confer with Cornfield and Cowett of IOS about the possibility of employees of IOS purchasing NOPIs. At this time King indicated that he intended to purchase NO-PIs. These discussions resulted in the IOS group agreeing to purchase approximately $20,000,000 worth of NOPIs in 1969. In this regard the trial court found:

> In February 1969, Mr. King advised Mr. Lowry [attorney for the King companies] that the IOS group had agreed to purchase approximately $20,000,000.00 in NOPI for each of three years, [1969–1971] the NOPI to be a mix of proven and wildcat properties.
>
> [R., Vol. 24 at 28].

The sales of the NOPIs were to be made by The Colorado Corporation. The NOPIs purchased in 1969 amounted to $22,500,000.00. This figure represents the total of the following purchases: $14,160,000 by Investors Overseas Bank Limited, acting as an agent for undisclosed IOS employees; $840,000 by IOS employees in New York; $500,000 by both David O. Ehlers and E. Keene Wolcott; and $6,250,000 by King. King paid 25% down as required by the terms of the purchase agreement for his NOPIs. This amounted to $1,562,500.

Additional pertinent provisions of the purchase agreement were:

1. From time to time, the NOPI proposed by [The] Colorado [Corporation] for purchase by Investor shall be tendered to Investor with a brief description thereof and the amount of the proposed purchase price. Investor shall have ten days after such tender to accept or reject the same provided rejection shall only be for a reasonable cause. Failure on the part of the Investor to reject the tender shall constitute an agreement by the Investor to purchase the tendered NOPI.

\* \* \* \* \* \*

2. Colorado shall retain title to the N.O.P.I. interests sold pursuant hereto solely for security purposes until Investor's notes given as part of the purchase price have been paid. However, after settlement date, all net receipts with respect to the N.O.P.I. shall be remitted promptly to Investor so long as there is no default in payment of interest or principal on the notes given in part payment therefor.

\* \* \* \* \* \*

3. Colorado agrees that it will keep the Investor currently advised as to the exploration, development, operation, abandonment and other significant activities concerning the oil and gas leases to which the N.O.P.I. purchased by the Investor relate and that not later than March 31st of each year commencing with the year 1970 it will furnish the Investor with a schedule suitable for inclusion in the Investor's United States income tax return showing the Investor's taxable income or loss during the preceding year arising from Investor's interests in said N.O.P.I.

[R., Petitioner's Exhibit CC].

Several months after these purchase agreements had been executed The Colorado Corporation completed the NOPI

tenders. Each tender was comprised of leases which had been acquired and committed to a drilling program by the date listed on the tender letter. None of the tenders were rejected.

As provided for by the terms of the various purchase agreements, The Colorado Corporation counseled the NOPI investors on the tax aspects of their NOPI investments. King was informed that in 1969 he received $140,220 in proceeds from his NO-PIs. Further, he was advised that he incurred losses due to abandonment or worthlessness of the underlying leases in the amount of $4,543,822.[1] Based upon this information King deducted the losses as an ordinary loss deduction on his 1969 tax return.

With the foregoing factual background, we now proceed to consider whether the trial court erred in ruling that King was entitled to a deduction for abandonment losses pursuant to 26 U.S.C.A. § 165(c)(2).[2]

The trial court found:

. . . The NOPI transaction as structured here qualifies for a deduction under I.R.C. § 165(c)(2). The only differences between this transaction and those which have been granted deductions in the past, are the name for the interest and the size of the losses generated. This is not enough to deny the deduction.
[R., Vol. 24 at 287].

While the factual background from which this claimed deduction arises is novel, the ultimate issue is a familiar one in tax law. That is whether this transaction was entered into for profit.

The Supreme Court in *Helvering v. National Grocery Co.*, 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346 (1936) recognized that the deductibility of losses under § 23(e)

of the 1939 Code (now § 165(c)(2)) depends on whether the taxpayer's motive in entering into the transaction was primarily profit. *See also* 5 Mertens, § 28.34. We agree with the IRS that in order to deduct a loss under § 165(c)(2) the taxpayer *must* show that profit was the primary motivation. *Austin v. Commissioner*, 298 F.2d 583 (2nd Cir. 1962); *Knetsch v. United States*, 348 F.2d 932, 172 Ct.Cl. 378 (1965), cert. denied 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966). The reason underlying the need to establish profit motivation is that the ordinary loss deduction allowed by § 165(c)(2) was not intended to extend to a transaction lacking economic substance, amounting to nothing more than a sham. *Norton v. Commissioner of Internal Revenue*, 474 F.2d 608 (9th Cir. 1973); *Knetsch v. United States*, *supra*. However, while profit motivation is required it is not necessary that the venture actually result in a profit. It has been recognized that even though the prospects of a profitable operation are negligible or even absent, that alone is not conclusive in determining the taxpayer's purpose. *See* 5 Mertens, § 28.34 and cases cited at n. 9. What need be shown is that the taxpayer entered into the venture in *good faith*, for the purpose of making a profit. *Lamont v. Commissioner of Internal Revenue*, 339 F.2d 377 (2nd Cir. 1964); *Hirsch v. Commissioner of Internal Revenue*, 315 F.2d 731 (9th Cir. 1963); *Doggett v. Burnet*, 62 App. D.C. 103, 65 F.2d 191 (1933). Accordingly, in order for an ordinary loss deduction to be taken on the NOPIs it must be shown that these transactions were entered in good faith for the purpose of making a profit.

The record supports the trial court's finding that King entered into the NOPI transactions for profit. The oil and gas business is very speculative. The number of unprofitable ventures clearly outnum-

---

1. The remaining NOPIs which King held were eventually sold to The Colorado Corporation in late 1970. Apparently this was done to provide additional collateral for Colorado's financial needs.

2. 26 U.S.C.A. § 165(c)(2) provides:
 There shall be allowed as a deduction any loss sustained during the taxable year and

not compensated for by insurance or otherwise.

\* \* \* \* \* \*

(c) . . .
 (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business.

bers the profitable ventures. The incentive to enter this high risk investment is that the proceeds from a successful venture may be and often are quite substantial. The facts lead to the conclusion that King's investments in the NOPI were profit motivated. He agreed to purchase a total of $6,250,000 in NOPIs in two separate agreements. For these interests, King paid $1,562,500 in cash and he executed promissory notes for $4,687,500. King received $140,202 as his share of the NOPI proceeds in 1969. That same year his share of the NOPI losses due to abandonment or worthlessness of the underlying leases was $4,543,822. Thus, in hindsight, King's losses obviously greatly exceeded his income from the NOPI for the year 1969. As the trial court observed, however, these transactions should not be viewed in hindsight. Rather, the proper focal point is at the time that King purchased the NOPIs. Mr. Hallman, an accountant for the King companies, testified that Imperial-American and Royal Resources were encouraging people to invest in the various King related joint ventures and partnerships based on the expectation of discovering and producing oil. Mr. Lowry, an attorney for King, testified in response to a question as to whether part of the reason for entering into the NOPI transaction was to generate some tax write-offs:

> You never try to generate tax write-offs, buy worthless properties and then abandon them. You try to generate profit. But you have the benefit if they turn up not to be profitable, then the loss is minimized by having a tax write-off for what you paid for the lease.
> [R., Vol. II at 259].

Further, King testified:

> There are thousands of programs that you can use in approaching major oil companies, independent investors, institu-

tional investors, etc., for purposes of— NOPI is just one of them. The whole object of the game is to make money.

We believe that the foregoing testimony demonstrates that the primary motivation at the time the NOPI agreements were executed was to generate profit. Even though the NOPIs did not produce a profit, they did create favorable tax benefits. We cannot, by hindsight, disallow this deduction simply because the NOPI transactions did not prove to be profitable. We hold that King entered the NOPI transactions in good faith for the purpose of making a profit. *Lamont, supra; Hirsch, supra.*

IRS further argues that the deduction should not be allowed because King did not enter into the transaction until late in 1969, and that at that time he must be found to have known that he was purchasing largely worthless dry holes. Our review of the record indicates that the trial court's findings relating to this contention are not clearly erroneous.[3] Fed.Rules Civ.Proc. Rule 52(a), 28 U.S.C.A.; *Quarles v. Fuqua Industries, Inc.,* 504 F.2d 1358 (10th Cir. 1974).

We affirm the trial court's judgment on this issue, even though we do not agree with the court's ruling which intimates that profit motivation need not be shown in order to establish entitlement to a deduction under § 165(c)(2). However, any error in this regard is harmless. 28 U.S.C.A. § 2111.

### III.

*Whether the district court properly determined the applicability of the interest equalization tax for IOS shares acquired for King's Bahamian trust and for the $3,000,-000 loan from King to the trust?*

The interest equalization tax was created by the Interest Equalization Tax Act, 26

---

**3.** The trial court found:

. . . while Mr. King did, of course, have access to these lease files and could perhaps, have obtained advance information with respect to the properties subject to the tenders, there is no evidence that he did so.
[R., Vol. 24 at 25].

. . . the Court must accept the uncontradicted testimony of Stanley Hallman as to the manner in which the selection was made and particularly that the tenders were prepared without knowledge of the results of drilling.
[R., Vol. 24 at 284].

U.S.C.A. § 4911, et seq. It was established to discourage the investment of American capital into foreign investments, and, as such, it imposed a tax "on each acquisition by a United States person . . . of stock of a foreign issuer . . .".[4] An exemption from the tax was allowed, however, if the acquisition was made from a United States person who had already paid the tax or who had acquired the foreign investment without liability for payment of the tax.[5]

King created an irrevocable Bahamian trust in June of 1968. The trust was allegedly established for purposes of holding and trading foreign securities free of federal taxes. King did realize that taxes on the trust would be deferred until trust funds were sent to the beneficial interests of the trust located within the United States.

During 1968, 1969 and 1970 King purchased and transferred numerous shares of IOS stock into the trust. We need discuss only those transfers pertinent to this appeal.

In late 1968, King purchased 40,000 shares of IOS stock which eventually became the property of the trust. The stock was previously owned by an American corporation, Lexington Research and Management Corporation. Although Lexington furnished King with a validation certificate establishing its prior American ownership, the certificate was never filed.

In September and October of 1969 an additional 173,500 shares of IOS stock were acquired for the trust through a brokerage firm. These shares were acquired by means of (1) a loan of $1,163,035.50 obtained from an IOS affiliate, Investors Bank, Luxembourg, and (2) a $1,366,540 loan from King.

In April, 1970, IOS was in the midst of a serious financial crisis precipitated by a failing stock market, a corresponding decline in the value of its security holdings, and a "liquidity drain from increasing redemption by fundholders". King was ap-proached. He was requested to arrange financing and to assume control of IOS.

Before King could obtain control of IOS he was obligated, among other things, to pay off the outstanding loans which an IOS affiliate bank had made to the trust for the purchase of IOS stock. Through a series of interrelated financial transactions, King secured $3,000,000 which was used to pay off the loans.

An interest equalization tax was assessed by IRS against King for the purchase of the 40,000 shares of IOS. The district court ruled that the tax was improperly assessed on the acquisition of the 40,000 shares. The court noted:

> In this case, IRS imposed interest equalization tax on the acquisition of the 40,000 shares of IOS stock from Lexington . . . because he (King) failed to file an application for a validation certificate within the 30 day time limit. While it is conceded that there was, in fact, such prior American ownership of this stock to make it exempt under § 4918 and that such a certificate would have issued if applied for, the Government contends that the prescribed certification procedure is the only way to avoid taxation and the time within which such application must be made has long since expired.

> \* \* \* \* \* \*

> To conclude that under these facts the failure to file an application for a validation certificate prohibits reliance on the prior American ownership exemption would be the kind of glorification of form over substance which governmental counsel have so sharply criticized in this litigation. The evidence in this case clearly establishes the exemption for this acquisition and it must be allowed.

(The court also determined that the transfer from King to the trust was not subject to an interest equalization tax because it was effectuated on May 22, 1969.[6] and also because there was no evi-

---

**4.** 26 U.S.C.A. § 4911.

**5.** 26 U.S.C.A. § 4918.

**6.** Had the transfer occurred after June 9, 1969, it would have been subject to the rebuttable presumption of 26 U.S.C.A. § 4912(b)(1)(B)

dence to show that the stock was used to acquire additional foreign securities.)

IRS contends that King's transfer of the 40,000 shares of IOS stock to the trust resulted in an interest equalization tax assessment. IRS contends that under § 4912(b)(1)(A) a United States person is deemed to have made a taxable acquisition of foreign securities if he transfers property to a foreign trust for less than full and adequate consideration, and if the trust acquired foreign securities that would have been taxable to the United States person had he acquired them directly. Section 4912(b)(1)(A) provides in part:

Any transfer (other than in a sale or exchange for full and adequate consideration) of money or other property to a foreign trust shall, if such trust acquires stock or debt obligations (of one or more foreign issuers or obligors) the direct acquisition of which by the transferor would be subject to the tax imposed by section 4911, be deemed an acquisition by the transferor . . .

IRS argues that "All that need be shown under Section 4912(b)(1)(A) is that a United States person made a gratuitous transfer to the trust, and that the trust acquired foreign securities that would be taxable if acquired by the United States person". Further, IRS urges that its position is supported by § 4912(b)(1)(B) which provides that if a United States person makes a gratuitous transfer (after June 9, 1969) to a foreign trust, it is presumed that the trust acquired foreign securities the transferor could not have acquired directly without being liable for the tax. IRS contends that § 4912(b)(1)(B) supplemented § 4912(b)(1)(A) because the IRS "often could not ascertain whether foreign trusts made acquisitions of foreign securities". Furthermore, IRS argues that the trust's later acquisition of additional IOS shares, while not a "direct purchase of foreign securities with the transferred property (40,-000 shares), both involved use of that property to repay or collateralize the loans by which direct purchases had been made".

We agree with the district court's finding that the interest equalization tax should not be assessed for the acquisition of the 40,000 shares. It is uncontested that King purchased the shares from Lexington, a prior American owner who had already paid the tax. Accordingly, King would not be assessed in light of the fact that the tax had already been collected. We also concur with the district court's finding that King's stock was transferred effective May 22, 1969, thus rendering the presumption within § 4912(b)(1)(B) irrelevant.

The reported decisions reviewing the application of the interest equalization tax are extremely limited. Furthermore, neither counsel, the district court, nor our independent research has disclosed specific case authority relative to the issue regarding King's purchase of the 40,000 shares of IOS. We nevertheless hold that the district court's ruling cannot be considered clearly erroneous.

IRS contends that King should pay interest equalization taxes on all of the 173,500 shares of IOS stock acquired through a brokerage firm for the trust in September and October, 1969. King cross-appeals, attacking the validity of the assessment to the extent of his loan to the trust. As already noted, these shares were purchased by moneys from two loans, one from an IOS affiliate bank, and the other from King. In allowing the assessment against King to the extent of his loan the court observed:

A transfer to a foreign trust which is not a sale or exchange is subject to this tax if the foreign trust acquires foreign stock

. . .

\* \* \* \* \* \*

There is no question that Mr. King would have been required to pay interest equalization tax if he had directly purchased IOS stock with his $1,366,540.00.

"that such trust subsequently acquired stock or debt obligations the direct acquisition of which by the transferor would be subject to the tax

imposed by § 4911, in an amount equal to the actual value of the money or other property transferred."

He has not escaped that tax by loaning money to the Bahamian trust for its acquisition of the stock.·

\* \* \* \* \* \*

It is concluded that to the extent of the $1,366,540, the assessment . . . is valid. The remainder of this assessment was based on the assumption· that John King borrowed from the IOS affiliate bank for the balance of the funds . . . . The evidence is that these were direct loans to the King Bahamian Trust and that portion of the assessment is therefore not supported in fact and must be considered invalid.

In a related vein, IRS contends that King must pay interest equalization taxes on the $3,000,000 he secured to pay off the trust's stock purchase loans in 1970. King contends here, just as he does in regard to his $1,366,540 loan made to the trust to purchase stock, that a loan from a United States citizen to a foreign trust constitutes an exchange for full and adequate consideration ·and that, accordingly, it is excluded from taxation under § 4912 of the Code. In upholding this assessment the court found:

> The debtor also asserts that his participation in this transaction was to provide $3,000,000 as cash collateral together with a guarantee of the King Bahamian trust to the extent of that amount plus the additional collateral in the form of the pledged stock of King Resources Company. Thus it is argued that he did not make a loan to a foreign trust.

> From the evidence presented . . . Mr. King then loaned $3,000,000.00 to the King Bahamian trust which used that money to pay Overseas Development Bank for outstanding loans to that trust. The proceeds of those loans had been used to purchase IOS stock earlier and that stock had been pledged as collateral for the loans.

> This loan of $3,000,000.00 was made in May 1970. Even if the evidence were not clear that the loan was used to release IOS stock from the pledges to Overseas Development Bank, the loan is subject to the presumption under 4912(b)(1)(B) and

that presumption of use to acquire foreign stock has not been rebutted. Thus there is interest equalization tax liability for this $3,000,000 transfer.

King contends that the interest equalization tax was improperly assessed against him for both loans that he made to the trust and that "The sole question raised on this appeal is whether the District Court was correct in concluding that a loan is covered under this provision (§ 4912(b)(1)(A)) and is not excluded as being a sale or exchange for full and adequate consideration." As noted, supra, under § 4912(b)(1)(A), any transfer for less than full and adequate consideration, which results in the acquisition of stock (the direct acquisition of which (stock) would result in a tax assessment), must be considered an acquisition by the transferor for which the tax is properly assessed. King argues that he should be assessed under the graduated tax rate of § 4911(b)(1)(B) pertaining to taxation of debt obligations òf a foreign obligor, rather than under the flat rate of § 4911(b)(1)(A) for the acquisition of stock.

■ We hold that the district court did not err in determining that a loan is not a "sale or exchange" and that it properly upheld the assessment of the tax relative to King's two loans. King cites no relevant authority supportive of his contention that a loan is a "sale or exchange" under the Interest Equalization Tax Act, and we have found none. Although the authorities are extremely limited on this issue, the House Ways and Means Committee Reports (H.Rep.No.1046, 88th Cong., 1st Sess., p. 27 (1964–2 Can.Bull. 708, 726) clearly states:

> The exception to the special rule relating to a sale or exchange for full and adequate consideration does not cover loans; loans are not considered sales or exchanges for this purpose.

We cannot unilaterally broaden the language of a statute beyond that which Congress intended to control. We affirm the district court's judgment that interest equalization tax should be assessed pursuant to § 4911(b)(1)(A), which taxes the ac-

quisition of stock of a foreign issuer at a flat rate predicated on the actual value of the stock.

King loaned money to the trust which was used to release IOS stock. Since a loan is not a "sale or exchange" and since King did not rebut the presumption of § 4912(b)(1)(B), King was properly assessed under § 4911(b)(1)(A). His argument that he should be assessed under the fluctuating rate of § 4911(b)(1)(B) must fail.

WE AFFIRM.

WILLIAM E. DOYLE, Circuit Judge (dissenting).

I respectfully dissent from the decision of the majority of the court that the transaction in question was a sale and not a gift subject to gift tax. The several differences follow.

## I.

I disagree with the majority's ruling that intent of Mr. King governed the entire transaction and was a factual matter which had the effect of rendering the finding unimpeachable.

The source of my disagreement on this ground is that intent of the donor is not the determining factor in deciding whether it is a gift or sale. Treas.Reg. Section 25.2511-1(g)(1) (26 C.F.R.) provides as follows:

> Donative intent on the part of the transferor is not an essential element in the application of the gift tax to the transfer. *The application of the tax is based on the objective facts of the transfer and the circumstances under which it is made, rather than on the subjective motives of the donor.* (Emphasis supplied.)

*Id.*

Also, the Supreme Court said in this regard in *Commissioner of Internal Revenue v. Wemyss,* 324 U.S. 303, 306, 65 S.Ct. 652, 89 L.Ed. 958 (1945), that: "Congress chose not to require an ascertainment of what too often is an elusive state of mind." *See also Commissioner of Internal Revenue v. Berger,* 201 F.2d 171 (2d Cir. 1953). Thus, even if the taxpayer expresses an intent to make

a sale, which is questionable evidence in most instances, the inquiry does not end there. The court as a matter of law must determine gift tax consequences by looking to the application of the statute and regulations and to the facts and circumstances. The court's view, then, must be objective.

## II.

Nor do I agree with the majority's determination that the evidence shows immunity from gift tax because the transfer was in the ordinary course of business within Treas.Reg. Section 25.2512–8 (26 C.F.R.). This latter regulation provides in part:

> . . . a sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth.

By its very terms the above regulation excludes transfer from the gift tax where the consideration is less than full and adequate. *See Commissioner of Internal Revenue v. Berger, supra,* at 173. Under this regulation business transfers for less than full and adequate consideration are excluded from the gift tax regardless of a price adjustment clause. *See Commissioner of Internal Revenue v. Berger, supra,* at 173. If, then, the transfer were a genuine sale in the ordinary course of business, no gift tax is due. And this is true even though the consideration may be adequate. The regulation itself brings this about and the price adjustment clause would be unnecessary.

## III.

Moreover, the determination of the majority that this is in the ordinary course of business cannot be upheld because the regulation requires that a transaction be bona fide, at arm's length, and without donative intent in order to be considered as in the ordinary course of business. The evidence establishes that this transaction rather than being in the ordinary course of business was an intra-family transaction, the main object of which was to transfer some of King's

wealth to his children. Such a transfer must be scrutinized with great care. It is presumed to be a gift. *Estate of Reynolds v. Commissioner of Internal Revenue,* 55 T.C. 172 (1970); *Clark v. Commissioner of Internal Revenue,* 205 F.2d 353 (2d Cir. 1953), aff'g 18 T.C. 780 (1952). It is difficult to conceive of a transaction being intra-family in character having the purpose of transferring wealth within the family and also having the character of a business transaction. *Cf. Robinette v. Helvering,* 318 U.S. 184, 63 S.Ct. 540, 87 L.Ed. 700 (1943). This conclusion is supported, to the extent that it is supported, by the fact that the price adjustment clause is included. It would be unnecessary if the transfer were truly one in the ordinary course of business.

It becomes all the more clear, therefore, that the intent was to avoid the gift tax and this court ought not to allow Mr. King to use this clause solely to avoid the tax.

### IV.

The clause is not justified by the reason of difficulty of evaluation which is no bar to the imposition of the tax. *See Smith v. Shaughnessy,* 318 U.S. 176, 63 S.Ct. 545, 87 L.Ed. 690 (1943). And, since the regulations are guides to the valuation of corporate shares, the responsibility for making evaluations for the purpose of determining tax consequences ought not to be shifted to the IRS as the clause apparently seeks to do.

### V.

I disagree also with the argument of the majority that giving effect to the price adjustment clause does not conflict with the purposes and the administration of the tax laws. By allowing the taxpayer to make retroactive price adjustment in respect to completed transactions, the court is allowing him to avoid tax consequences and to give effect to this effort would certainly deter the enforcement of the tax. Indeed if it were allowed to stand, and it is doubtful that it will, the effect would be substantial. The majority opinion attempts to distinguish *Commissioner of Internal Revenue v. Procter,* 142 F.2d 824 (4th Cir.), *cert. denied,* 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 606 (1944), wherein a savings clause which provided that property transferred in trust would revert to the settlor if found subject to gift tax was void as against public policy. The same result was reached in *Van Den Wymelenberg v. United States,* 397 F.2d 443 (7th Cir.), *cert. denied,* 393 U.S. 953, 89 S.Ct. 377, 21 L.Ed.2d 364 (1968). The majority opinion says that the cited cases involve changes in the nature of the transaction, whereas the instant clause did not so operate, but the price adjustment clause is intended to work a change in the nature of the transaction in that it attempts to transform what would be a gift into a sale.

It is to be noted that the Supreme Court has held that Internal Revenue provisions are to be interpreted to conform to the basic premise of annual tax accounting. If you give effect to the price adjustment clause you are in effect saying that a private agreement can effect a retroactive change in a completed transaction and its tax consequences. To allow non-business transfers to remain unsettled until the Service makes an adverse determination would render tax liability unsettled at least until the statute of limitations had run. *Van Den Wymelenberg v. United States, supra,* at 445.

Accordingly, the price adjustment clause is in conflict with the principle that once a transaction and a tax year are completed, the tax consequences attach and retroactive adjustments in the transaction are not allowed to alter these tax consequences.

On its face this transaction is not and cannot be a sale. Surely the law of gift taxation does not call for an entirely different set of definitions and principles. Unless it does, the present holding cannot be sustained.