**In the Matter of KING RESOURCES COMPANY, and International Resources, Ltd., Debtors.**

**UNITED STATES of America, INTERNAL REVENUE SERVICE, Appellants,**

**v.**

**KING RESOURCES COMPANY and International Resources, Ltd., Appellees.**

**No. 78–1870.**

United States Court of Appeals, Tenth Circuit.

Submitted Sept. 11, 1979.

Decided Jan. 31, 1980.

---

Richard W. Perkins, Atty., Tax Division, Dept. of Justice, Washington, D.C. (M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Atty., Tax Division, Dept. of Justice, Washington, D.C. and Joseph F. Dolan, U.S. Atty., Denver, Colo., of counsel, with him on brief), for appellants.

John S. Pfeiffer, Denver, Colo. (Robert F. Wilson, Denver, Colo., with him on brief), for appellee, Charles A. Baer, Trustee, of King Resources, Co.

Before SETH, Chief Judge, HOLLOWAY and McWILLIAMS, Circuit Judges.

SETH, Chief Judge.

This appeal concerns the tax assessment and claim in bankruptcy by the Internal Revenue Service against King Resources Company for Interest Equalization Taxes under 26 U.S.C.A. (I.R.C. 1954) §§ 4911 et seq. There were other transactions and issues at trial, but the case on appeal concerns only the advance of King Resources Company (KRC) of 7.8 million dollars to pay off the indebtedness of several Bahamian trusts owed to banks apparently controlled by Investors Overseas Services. The trusts had been created for the benefit of members of the family of John M. King and Edward Cowett. To support the loans the trusts had pledged shares of stock in Investors Overseas Services (IOS) as collateral. *See King v. United States,* 545 F.2d 700 (10th Cir.), for other aspects of these trusts as to Mr. King personally and for a further description of the general background.

At the time the events took place, KRC was one of the principal sources for investments used by IOS for its revenues generated by the sale of mutual funds of various kinds. Likewise for KRC Investors Overseas Service was a good customer for sales of oil, gas, and mineral interests or participations. Sales to IOS made up about fifty percent of KRC's dollar sales.

IOS began to have some financial problems at the end of 1969 and the first part of 1970. The addition of a substantial amount of cash became necessary and the urgency was escalating rapidly. A possible source of funds was KRC, and Mr. Cowett, the president of IOS, went to Denver in April of 1970 to seek help. This was to be from KRC directly, and to have KRC create a consortium to provide financial help on a large scale. This situation was taken by Mr. King and the controlling group at KRC as an opening for KRC to obtain control of IOS. It is apparent from the record that this group immediately embarked on this ambiguous and ill-fated project. An agreement to this end was entered into with Mr. Cowett on his visit to Denver in April. We are concerned with a portion of this agreement, or at least with the beginning of the implementation of the plan to take over IOS. The financial plight of IOS was serious, and in view of its size and the ramifica-

tions of its activities worldwide, the problem was large.

Officers of KRC, especially Mr. King, considered a consortium to provide funds to IOS, a direct loan of eight million dollars to IOS by KRC, and the use of KRC funds to pay off the loans of the King and Cowett Bahamian trusts. This payoff would release the IOS voting shares there pledged as collateral, and also avoid the appearance of a conflict of interest which could arise from the loans by IOS banks to the personal trusts of the principals in the planned consortium to provide the badly needed money to IOS.

The funds of KRC were advanced or committed by Mr. King for these purposes without the prior authorization by the corporation. The documents were executed on behalf of Mr. King. Thus the Government's position is dependent upon a ratification by the corporation of the acts of the corporate officers and agents. The loans of the trusts were paid off with KRC funds in the amount of 7.8 million dollars. The details of the funding are not significant here. The resultant loans by KRC to the trusts were considered to be an acquisition of foreign securities and assessed the equalization tax.

The trial court concluded that the corporation KRC did not ratify the acts of its agents in advancing the funds to the trusts. Thus with no ratification no tax would be due by the bankrupt KRC.

As mentioned above, there was an eight million dollar advance by KRC to IOS directly about the same time. The trial court concluded that this action taken by Mr. King was ratified by the corporation.

Since the trial court concluded that the 7.8 million advance to the King and Cowett trusts was not ratified, we are only concerned with the transactions with the trusts. The matter of ratification by the corporation of the officer-agent's acts is a mixed question of law and fact. It requires an examination of the corporate acts and records for its resolution. Much of the dispute centers on the corporate minutes of June 1st, June 16th, and August 11th of 1970. The IRS relies on the minutes as

they appear in the corporate records, and assert that KRC accepted the benefits of the transaction. The Trustee put on testimony by corporate directors and officers which cast doubt on the recitations of approval in the minutes. Shortly after the June 1st meeting, and perhaps even before, the situation at IOS became hopeless, and the funding sought to be arranged by a consortium became impossible. As to ratification and its consequences, we said in *Justheim Petroleum Co. v. Hammond*, 227 F.2d 629 (10th Cir.): "It is well established that where a person without authority assumes to act as the agent of another who later affirms or adopts what has been done, the latter is bound to the same extent as though authority had been given in the first instance." In *Davies v. Lahann*, 145 F.2d 656 (10th Cir.), we held that ratification relates back to the date of the contract. Thus if there was a ratification, it was of the initial undertakings and advances, those of KRC as of the date they were accomplished by the agents.

It appears to us that the difference in the trial court's view of the 8 million dollar loan to IOS, and the 7.8 million dollar loan to the Bahamian trusts was the personal interest of King and Cowett in the trusts. This raises the question as to the basic purpose for the advance to the trusts.

We are convinced that the main and underlying objective of all the meetings and efforts by KRC were directed to the takeover of IOS. The Bahamian trust matter was an incident in the whole program, and the immediate availability of IOS voting shares from that source made it a corporate venture. The trial court concluded that the repayment of the trust loans was ". . . an express or tacit requirement . . ." of the takeover plan. KRC, had the takeover been successful and IOS rehabilitated, would have stood to make enormous gains. The business relationship between the two above referred to demonstrates this.

The record shows that the takeover and consortium proposal was made to KRC. Mr. Cowett came to Denver and presented the matter. Before he left Mr. King stated in a letter the basic understanding which had been reached. This letter of April 28th

was not on a corporate letterhead and was signed by Mr. King personally. The letter recites that Mr. King was holding whatever rights were acquired for the benefit of KRC. There were reasons stemming from SEC rulings why KRC would not then deal directly and could not acquire IOS stock directly.

The IOS takeover was extensively discussed at a KRC board meeting on June 1st. The relationship between KRC and IOS was discussed as was the possible advantage which could be gained by a takeover. KRC theretofore had invested in IOS stock and IOS was indebted to KRC in substantial amounts. The corporate records show the minutes of the June 1st meeting included an express ratification of the 8 million dollar loan to IOS. As to the 7.8 million dollar loan to the Bahamian trusts, they recite:

"Thereupon, the following resolutions were duly adopted with Mr. John M. King not voting:

"RESOLVED, that the loan to the Edward Cowett family trust of $2,944,-571.29 be and the same is hereby approved; and

"FURTHER RESOLVED, that the loan to the John M. King family trust of $6,984,005 be ratified and approved, subject to a guaranty of John M. King to pay to the Company within 30 days after June 30, 1973, an amount equal to any unpaid portion of the loan less an amount equal to the profit realized by International Resources, Ltd., from the sale or other disposition of the three-year warrants to purchase shares of I.O.S. Ltd."

The record shows that Mr. King personally guaranteed the loan in a statement by him quoted in the minutes. A written guarantee was later executed.

As to the board meeting of KRC on June 16th, the corporate records include these minutes:

" . . . [T]hat the action of the Board of Directors taken at its meeting of June 1, 1970 in approving a loan to the King family offshore trust be ratified and confirmed . . . [subject to the collaterization previously discussed]."

Mr. King at the meeting had already stated he would not put up collateral for the personal guaranty but he would suggest that others do so.

The June 1st minutes were considered at the August 11th meeting and were approved as follows:

"Following discussions and upon motion duly made, seconded and carried, the draft of the minutes of the Board of Directors meeting held June 1, 1970, as circulated were amended and approved."

Apparently there was never any further reference to the Cowett trust loan in the corporate minutes after the June 1st minutes.

The Trustee urges that the June 16th minutes condition the ratification. Also the Trustee's witnesses who were officers or directors stated in substance that there was really no ratification on June 1st. But this is difficult to explain in view of the June 16th minutes.

The trial court relied on the corporate minutes rather than testimony of the witnesses to reach its conclusion as to advance authorization.

No evidence appears of an attempt on the part of those testifying for the Trustee to correct the minutes. This factor is significant in view of the obvious dangers in the IOS dealings. The minutes are the best evidence. In 9 Fletcher Cyc. Corp. (Perm. Ed.) 639, the following statement is made:

" . . . On the other hand, if the corporate minutes of the acts, resolutions or proceedings of a corporation are complete, and it does not appear that there is any fraud, mistake, error or omission, parol evidence is not admissible to contradict, modify or vary the record."

This obviously is not a universal holding, but minutes are generally considered to be at least prima facie correct.

The June 1st minutes in the corporate records were not impeached by testimony of individual directors given long after the adventure had proven disastrous. The minutes are presumptively correct and no substantial evidence to the contrary was produced.

We must hold that the trial court's conclusion that there was no ratification must be set aside for the reason that there was an express and complete ratification in the June 1st minutes which was not thereafter undone.

We conclude that the Bahamian trust loans were ratified by KRC as corporate acts.

It is apparent that the issue remains as to whether section 4912(b)(1)(B) is applicable. *See King v. United States*, 545 F.2d 700 (10th Cir.), which concerned the interest equalization tax as to Mr. King personally in basically the same context.

The case is REVERSED and REMANDED.

McWILLIAMS, Circuit Judge, respectfully dissents:

The issue of ratification is an issue of fact which, under the circumstances disclosed by the present record, should not be disturbed by us on appeal.