JAMES B. KURTZ AND KATHARINE C. KURTZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; W. C. KURTZ, JR., AND ALMAE MAE KURTZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kurtz v. Commissioner
Docket Nos. 10985-82, 11086-82.
United States Tax Court
T.C. Memo 1985-410; 1985 Tax Ct. Memo LEXIS 222; 50 T.C.M. (CCH) 695; T.C.M. (RIA) 85410; August 12, 1985. William S. Huff,Charles A. Ramunno, *223 and Bruce N. Lemons, for the petitioners. *
Theodore J. Kletnick and William F. Garrow, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: In docket No. 10985-82, respondent determined a deficiency in income tax for the 1978 taxable year of James B. Kurtz (JBK) and wife Katharine C. Kurtz in the amount of $379,432.00. In docket No. 11086-82, respondent determined a deficiency in income tax for the 1978 taxable year of W. C. Kurtz, Jr. (WCK) and wife Alma Mae Kurtz in the amount of $373,230.00. In these consolidated cases, the principal issue for decision is the deductibility of short-term losses in excess of $900,000 incurred by each petitioner-husband in commodities futures straddle trading where the investment plan followed the typical tax straddle strategy. [1] In addition, in docket Nd. 10985-82 respondent, prior to trial, raised a new issue--that a component of the loss claimed by JBK and wife, a loss of $480,740 incurred on the disposition of a gold futures *224 position on November 16, 1978, would in any event be disallowed under section 267. [2] Although not raised in the statutory notice or contained in any pleading, the parties have tried this issue and we will treat it as properly before the Court. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time each of the petitions was filed, each petitioner was a resident of the state of Colorado. Petitioners filed their respective Federal income tax returns on the calendar year basis using the cash receipts and disbursements method of accounting. JBK *225 and WCK are brothers (collectively the Brothers and sometimes severally the Brother). Their wives are parties only by reason of having filed joint income tax returns with their respective husband. Background Information
Following military service in World War II, JBK and WCK returned to Colorado to participate actively in their incorporated family lumber business. In early 1978, at the time of the sale of that business, JBK was the president. The principal shareholders were JBK, WCK, their sister, and members of these three families (including trusts). The outstanding stock was sold to Boise Cascade Corporation on April 12, 1978 for an aggregate cash price of slightly over $19 million dollars. Long-term capital gains were realized by JBK and his wife in the amount of $3,333,691.00, and by WCK and his wife in the amount of $3,286,203.00. Both Brothers, as well as the family lumber company, had long used the accounting and tax planning services of the public accounting firm of Ernst & Ernst, now known as Ernst & Whinney. In 1978 the Brothers' regular accountant with that firm was Herbert LaMee, but they also knew and had utilized from time to time Nels Tamplin, now *226 deceased, but then a senior tax partner and tax planner with that accounting firm. Tamplin was well versed in the mechanics and tax consequences of commodities futures trading. In 1978, JBK had little if any understanding of commodities futures trading while WCK had had limited exposure to that subject. During the summer of 1978, JBK was contacted by Douglas Gray, an account executive with E.F. Hutton & Co., Inc. (Hutton), who was soliciting pension fund business. In the course of conversations with JBK, Gray found out about the large capital gain from sale of the family business and commenced to solicit other trading business. In late August or early September 1978, the Brothers met with Gray, James Robb, a Hutton regional Commodities director with extensive experience in commodity futures trading, Tamplin, and perhaps with LaMee to explore futures trading in some detail. Prior to that time, the Brothers had had conversations among themselves and probably with Gray or Tamplin or both which were sufficient to interest the Brothers in the possibility of investing in futures both for profit, as an inflation hedge, and for the tax advantages of tax straddles. [3] Prior to this meeting *227 Tamplin and Robb had together participated in the planning the execution of futures trades for other clients of Tamplin. During the meeting Robb was requested to prepare and submit to the Brothers a letter summarizing the Hutton straddle proposal. The letter was prepared with some assistance from John Sawyer, a commodities account executive in Hutton's national commodities department in New York City. Sawyer had had extensive experience in the planning, implementation, and execution of tax straddle transactions for other Hutton customers located throughout the United States. Transactions in Issue
The original of the Hutton letter dated September 18, 1978 was delivered to JBK and copies to WCK and to Tamplin. The letter explained certain aspects of commodities futures trading, defined terms and discussed the mechanics of a tax straddle. The letter states: The goals of *228 a tax straddle are as follows: First, to establish loss and eliminate 1978 tax liability. Second, to accomplish the gain. Third, to make that gain long term. Fourth, loss [sic] as little as possible in total cost (risk and commission) and fifth, to make a profit. The letter served to illustrate to JBK and WCK how tax straddle trading could be used to reduce their 1978 capital gain tax liability by rolling part of the 1978 long-term capital gain forward to 1979 while minimizing the possibility of loss (economic loss and transaction costs). While profit is listed as one of the goals of a tax straddle, [4] the two examples contained in the letter which show the results of deferring $100,000 and $500,000 of gain each results in a small out-of-pocket cost to the participants.
Thereafter, on or about October 26, 1978, the Brothers met with Tamplin and Robb to discuss the Hutton proposal. Handwritten notations made contemporaneously *229 by each of the Brothers on their respective copies of the Hutton letter indicate that this discussion revolved around the acquisition of gold and silver futures straddles with the objective of each Brother realizing a tax loss of approximately one million dollars, which was expected to result in a substantial tax savings. The Brothers understood that the program would have to remain in effect for 6 months in order for gain in the long position to be treated as long-term capital gain when realized in 1979. The Brothers also understood the principal risk to be a loss of 11 percent of the sum of money required to be deposited with Hutton as margin, i.e., the sum of $100,000, and, in addition, payment of the deferred tax plus 6-percent interest if the transaction did not withstand respondent's audit. The profit potential was 100 percent or more of the margin deposit. [5]Hutton's New York City office would develop and recommend the actual trades. Before agreeing to enter into the proposed tax straddle trading, the Brothers also consulted with a Denver, Colorado tax attorney who apparently confirmed the advice they had received but who suggested that the use of some open positions in *230 addition to straddles would be helpful. Open positions were not, however, used. On some date prior to November 13, 1978, the Brothers agreed to engage in commodities tax straddles involving gold and silver futures to be recommended by Sawyer, subject to the advice of, or the concurrence of, Tamplin. On October 31, 1978, JBK and WCK each established nondiscretionary commodities futures accounts with Hutton for this purpose. [6] The trading activity and results are shown on the four charts which together constitute Appendix A hereto. The transactions on the charts illustrate typical tax straddle programs. At the time of the initial transaction on November 13, 1978, JBK and WCK each knew and intended to participate in such tax straddle programs. Although the positions acquired by each Brother are slightly different, they reflect identical trading strategies and were treated as such by Sawyer and Robb and presumably Tamplin. *231 With two exceptions there is no persuasive evidence that either Brother knew of or approved in advance any of the trades. The first exception is the conversion on November 22, 1978 of the simple silver spreads acquired on November 13, 1978 into butterfly spreads. The reason for the disposition of these initial silver spreads, in addition to the realization of tax losses, was the uncertainty as to the silver market caused by the activities of the Hunt brothers in their disastrous silver trading, apparently then starting to affect the silver commodity market. This factor was discussed with the Brothers. Thus, they probably did not know in advance what positions were to be acquired in the switch and may not have known what positions were to be disposed of; they did understand that some change would be made in their silver positions. What is principally significant, however, is not so much that the Brothers and their advisers were concerned that abnormal and unpredictable factors were affecting the silver futures market, materially increasing risks, but that they nevertheless maintained silver straddles with substantially the same economic potential and stayed with the program for *232 the requisite 6-month period. The second exception occurred after margin calls were made on each Brother. In December 1978 and again in January 1979 margin calls were made on WCK. In January 1979 margin calls were made on JBK. They then instructed their advisors to take action to make certain that no further margin calls would be made. On February 14, 1979, each Brother disposed of one-half the units of gold futures then held. The reduction in their investments in gold straddles apparently served to avoid further margin calls. It is again significant that both Brothers retained their long positions and remained in the tax straddle program until the middle of May 1979. Finally by May 18, 1979, immediately after the 6-month capital gain holding period had passed, JBK and WCK each instructed their advisors to close out their commodities futures positions. By this time they were thoroughly disenchanted with tax straddle trading, apparently because of the large economic losses suffered. The primary objective of JBK and WCK in entering into this investment program was to achieve in 1978 approximately $1,000,000 in realized tax losses for each Brother and to realize a like capital *233 gain in 1979 after the 6-month holding period with minimal net costs. Each of the Brothers did have as a secondary motive the realization of net profits and the ultimate hope that futures trading could be an attractive inflation hedge. Unfortunately, by February 1979, it had become apparent to them that futures trading was not the hoped for panacea to solve their inflation worries, but they, nevertheless, continued with the investments until the long-term capital gain period had been attained. During the period November 1978-May 1979, JBK acquired four gold straddles and two silver straddles. During the same period, WCK acquired five gold straddles and two silver straddles. [7] In the case of each such straddle, there was on the date of its acquisition a reasonable prospect of some profit therefrom.The direction of the market in both bold and silver futures was not predictable with reasonable accuracy and was subject to influence by many factors, such as the Hunt brothers trading, over which neither of the Brothers nor their advisors had any control. But it is also a fact that between 80 and 85 percent of all commodities futures trades lose money. *234 The Section 267 Issue
In order to place into proper perspective the issue as to applicability of section 267, the workings of the Commodity Exchange of New York (COMEX) through which these trades were effected must be outlined. [8]COMEX is a board of trade regulated by the Commodity Futures Trading Commission. Its members such as Hutton effect trades through a clearing organization or clearinghouse, in this case established by COMEX members. The COMEX Clearing Association, Inc. (Clearinghouse) clears or effects trades for COMEX somewhat analogous to the way in which a bank clearinghouse settles checks drawn on one member bank and cashed by another member bank. Trades are actually executed by a floor broker who may be employed by the COMEX member making the trade or by an independent member. In the customary case, the floor broker receives instructions from the account executive of a member on behalf of a customer to acquire, for example, a specified position or a series of positions comprising a straddle. The trade is effected by public outcry and must be matched by another floor broker who has an order or orders for the mirror images of the positions to be acquired. [9] *235 The two floor brokers thereafter report their matching trades to Clearinghouse which assumes the obligations of each broker to the other. Thus, Clearinghouse becomes the seller to each buyer of a futures contract and the buyer to each seller of a futures contract. No buyer or seller, whether deemed to be the exchange member or the member's customer, is permitted to become obligated to another seller or buyer. All trading of futures is required to be effected on the floor of the exchange; futures contracts cannot be traded outside the exchange. Neither COMEX nor Clearinghouse recognizes or purports to deal with the investor; the member making the trade is treated as the principal. *236 Very few speculators such as the Brothers hold or intend to hold their positions to maturity so as to take or make delivery of the commodity. Where not held to maturity, the position is closed out by acquiring the mirror image of the position. Clearinghouse then simply cancels the positions on its records, but on such records the holder of the positions is the broker, not the broker's customer. It will occasionally happen that a floor broker receives for execution an order or orders for both sides of a particular position, i.e., the mirror image positions. Such order or orders must be for the benefit of different customers and may be received from the same or two different exchange members. Pursuant to COMEX and Clearinghouse rules, the floor broker may, if he wishes to do so, announce on the floor that he has orders for the matching positions at a specified price. If no other broker accepts or matches all or any part of either position, the broker may execute the two trades by matching them and reporting the trades as "crossed." Again, Clearinghouse intervenes and becomes the second party as to each trade. [10]
*237 On November 16, 1978, JBK closed out his 260 long December 1979 gold position by selling 260 short December 1979. On the same day WCK bought 260 long December 1979. The transaction price of JBK's short position was the same as that of WCK's long position.A floor broker's report to Hutton appears to indicate that two trades were crossed that day which involved 260 units of some commodity. [11] While the evidence that the crossed trades were the trades for the Brothers is entirely circumstantial and at best ambiguous, the parties appear to assume that the trades were crossed, hence we so find. However, there was no knowledge of this fact on the part of the Brothers or Robb and Sawyer until the time of trial preparation. Neither was there any direction by Sawyer to the floor broker to effect a cross-trade, and under COMEX rules there could be no advance assurance of a cross-trade. Finally these trades, although crossed, were executed fully in accordance with COMES rules. In this instance, JBK realized *238 a loss of $480,740 when he closed out his 260 December 1979 long gold position. In point of fact, no cash ever changed hands, although some of the margin deposit may have been used. Hutton held the short position for the benefit of JBK, acquired on November 16, 1978, only long enough for Clearinghouse to match it against the long position held on its records by Hutton and cancel both positions. On the other hand, on November 16, 1978 Hutton became for WCK on Clearinghouse's records the holder of 260 long December 1979 gold futures. In the absence of extraordinary circumstances such as the 1979-1980 Hunt brothers activity in the silver futures market, speculators such as the Brothers do not take or make delivery of the commodities or hold the futures contracts to delivery date. Speculator trades are closed out before delivery. While we assume that there was a sufficient supply of gold and silver so that all of the Brothers' trades could have been held to delivery, there is no evidence on this point. OPINION In this case we were impressed by the forthright and thoroughly credible testimony of the Brothers. Our finding that their tax motive was primary was not easily made. *239 We are convinced that each Brother had a genuine interest, hope, and perhaps expectation of substantial profit from their straddle investments. However, we do not believe that they would have undertaken this course of investment activity, over a pre-ordained 6-month period and totally in reliance upon the advice of others, if they had not been convinced that it would result in substantial tax savings at little if any cost. Moreover, the fact that the Brothers were willing to hold their straddle positions, notwithstanding margin calls and problems in the silver market, until the expiration of the 6-month holding period demonstrates the priority attached by them to the tax sheltering aspects of the program. Since the tax objective was predominate, the cases of Smith v. Commissioner,78 T.C. 350 (1982), and Fox v. Commissioner,82 T.C. 1001 (1984), would be dispositive but for section 108 of the Tax Reform Act of 1984 (section 108).[12] However, this case is controlled by section 108 and by our decision in *240 Miller v. Commissioner,84 T.C. 827 (1985). As in Miller, the trades by the Brothers took place in 1978 and 1979, obviously prior to the end of the year 1981; they involved the dispositions of positions which formed parts of straddles; and the amendments made by title V of the Economic Recovery Tax Act of 1981 [13] do not apply. Each of the straddles acquired in 1978, with respect to which a loss was realized on the disposition in that year of a position constituting a part thereof, was a transaction which when entered into had a reasonable prospect of some profit. Thus, section 108 and Miller mandate a decision for petitioners in each of these dockets, unless as to petitioners James B. Kurtz and wife, section 267 requires, in part, a different result. The Section 267 Issue
[14]
*241 Section 267 disallows losses on sales between related persons. In order for JBK to realize a loss on November 16, 1978 on his December 1979 long gold position, he acquired an offsetting short position.Since at the same time and for the same sum of money WCK acquired a similar long position, respondent argues that JBK sold 260 December 1979 gold futures contracts to WCK. In pertinent part section 267 provides: (a) Deductions disallowed.--No deduction shall be allowed-- (1) Losses.--In respect of losses from sales or exchanges of property (other than losses in cases of distributions in corporate liquidations), directly or indirectly, between persons specified within any one of the paragraphs of subsection (b). * * * (b) Relationships.--The persons referred to in subsection (a) are: (1) Members of a family, as defined in subsection (c)(4); * * * (c) Constructive ownership of stock.--For purposes of determining, in applying subsection (b), the ownership of stock-- * * * (4) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants; * * * Section 267(a) would disallow a *242 loss on a sale or exchange of property between the Brothers. Respondent seems to assume that JBK's long position was somehow acquired by WCK. But, under the COMEX and Clearinghouse rules, the long position was not transferred to WCK; rather it was wiped out by acquiring the offsetting short position. The identical long position formerly held by JBK was not acquired by WCK--what did happen was that the mirror image of the short position acquired by JBK to close out his long position was acquired by WCK at the same time. The narrow issue before us is whether such a series of transactions is for tax purposes to be placed in the same category as a sale or exchange of property between family members. Is a futures contract, such as 260 December 1979 long gold, property within the meaning of section 267? In legal effect did JBK transfer his 260 December 1979 long position to WCK? Was there any sale or exchange between the Brothers? Unfortunately, both petitioners' and respondent's arguments on brief on this issue are superficial. Respondent simply relies upon *243 McWilliams v. Commissioner,331 U.S. 694 (1947), while petitioners rely upon Bache Halsey Stuart, Inc. v. Affiliated Mortg. Invest., Inc.,445 F. Supp. 644 (N.D. Ga. 1977). A stock certificate is recognized to be property (section 317) and we long ago held that futures contracts were choses in action and thus property subject to treatment as capital assets. Covington v. Commissioner,42 B.T.A. 601 (1940), affd. on this issue 120 F.2d 768 (5th Cir. 1941); Vickers v. Commissioner,80 T.C. 394 (1983). We see no reason to conclude that futures contracts would not be property for section 267 purposes and we so hold. That does not, however, dispose of this issue. For proper analysis of this issue, we must focus on the mechanics of trading on a commodity exchange which fortunately Judge Friendly in a recent decisidon, Leist v. Simplot,638 F.2d 283 (2d Cir. 1980), has explained as follows: A commodity futures contract is simply a bilateral executory agreement for the purchase and sale of a particular commodity. The seller of the contract commits himself to deliver the commodity at a fixed *244 date in the future, while the buyer commits himself then to accept delivery and pay the agreed price. * * * Every aspect of the futures contract is standardized except price. * * * Standardization also makes the contracts fungible. Original sellers and buyers and therefore offset their positions by acquiring opposite contracts, either paying or gaining any price differential. * * * * * * It is a rare case, however, in which actual delivery takes place pursuant to a futures contract. Save in these rare instances, the short and long must liquidate their positions prior to the close of trading in the particular futures contract. Although the means by which this is done is routinely referred to as futures trading, futures contracts are not "traded" in the normal sense of that word. Rather they are formed and discharged. * * * A person seeking to liquidate his futures position must form an opposite contract for the same quantity, so that his obligations under the two contracts will offset each other. Thus, a short who does not intend to deliver the commodity must purchase an equal number of long contracts; a long must sell an equal number of short contracts. * * * * * * *245 When two traders have reached an agrement on the floor of the exchange, the role of the clearinghouse comes into play. The clearinghouse, a key link in the futures trading system, operates trading system, operates as the seller to all buyers and the buyer from all sellers, thus facilitating the interchangeability of the contracts and the cancelling of positions. * * * The clearinghouse treats FCM's [brokermembers] as principals in trading transactions and demands margin payments from them. * * * [638 F.2d at 286, 287. Citations and fn. ref. omitted.] For present purposes, one significant point with respect to trading commodities futures is that, for trading purposes the brokers, not their customers, are deemed to be the principals. Moreover, when the Clearinghouse accepts the trades the reporting brokers are freed from their inter-broker responsibility as buyers or sellers. In re Rosenbaum Grain Corp.,112 F.2d 315, 317 (7th Cir. 1940). Also, we note that commodities futures contracts can only be traded on and through a commodity exchange; it is illegal to trade them outside the exchange machinery. 7 U.S.C. section 6 (1982). *246 Finally, as Judge Friendly points out, futures contracts are not actually traded or exchanged. A further point we must address is whether or not there is any significant difference between trades in commidities futures effected on COMEX and trading in shares of stock on the New York Stock Exchange. We believe that there are differences which are critical to this tax issue, although in other contexts courts have held that there is no significant difference between trading on the two exchanges. See e.g., In re Rosenbaum Grain Corp.,103 F.2d 656 (7th Cir. 1939); see also Covington v. Commissioner, supra.
Shares of stock of the same class of an issuer are considered to be fungible and, in most if not all respects, futures contracts of the same commodity for the same month are also fungible. However, shares of stock may be traded between parties, off as well as on an exhange, and the equity interest in the issuer which is represented by a certificate of stock does, in fact, change hands when shares of stock are traded. By comparison, as Judge Friendly points out, commodities futures contracts are simply bilateral agreements, and they are not really *247 traded at all; they are formed and discharged, which can be done lawfully only on a commodity exchange. The futures contract itself merely represents a right to acquire the commodity in the future. At most the broker-exchange member acquires some species of equitable interest in the commodity. In re Rosenbaum Grain Corp.,103 F.2d 656 (7th Cir. 1939). Whether the investor's interest would rise to such level is unclear. If the subject matter of the November 16, 1978 transaction had been shares of stock, we would be required to find a direct sale or exchange between the Brothers. We are convinced, however, that there was not here, nor can there be under the rules and regulations of COMEX and Clearinghouse, a direct sale or exchange of a futures contract between investors. The gold futures contracts consisting of 260 December 1979 long were not transferred directly by JBK to WCK within the meaning of section 267. The contracts, in fact, were not transferred at all. They were discharged in a transaction with Clearinghouse. There was no direct transaction between the Brothers, even though the economic reality may have been substantially the equivalent. See *248 Vickers v. Commissioner,supra.[15]
There remains, however, the question whether this was an indirect sale or exchange between the Brothers for purposes of section 267 under the rationale of McWilliams v. Commissioner,supra. In McWilliams there was no direct exchange between the husband and wife. The husband for himself and his wife *249 directed their broker to sell shares of stock owned by one of them in order to realize a tax loss and immediately to reacquire for the other spouse the same securities in order to preserve their investment. It was stipulated that unknown third parties bought from one and sold to the other spouse. However, because the transactions were prearranged to secure a tax deduction, the Supreme Court found an indirect sale or exchange between the spouses. That rationale is not applicable to the facts of this case. In McWilliams for purposes of section 24, the predecessor of section 267, there was a sale or exchange in economic effect between the spouses. But as we said in Hassen v. Commissioner,63 T.C. 175, 187 (1974), affd. 599 F.2d 305 (9th Cir. 1979), there must be a nexus between the sale and the purchase for the McWilliams indirect sale doctrine to apply. Where there is no direct transaction, that nexus is supplied by the prearranged plan present in McWilliams but lacking in our case. See also *250 Merritt v. Commissioner,47 T.C. 519 (1967), affd. 400 F.2d 417 (5th Cir. 1968), especially Raum J. concurring: The Supreme Court in McWilliams emphasized prearrangement in a context giving an expansive reading to the statute, not a limiting one as is urged in the dissenting opinion herein. The presence of prearrangement in McWilliams was significant in classifying two otherwise independent sales and purchases on the stock exchange as a single sale between the spouses, thus giving broad meaning to the word "indirectly" in the statute. Giving section 267 the expanded application directed by McWilliams, we still cannot find here a proper basis for concluding that there was an indirect sale or exchange between the two Brothers for section 267 purposes. That there was no design or intention on the part of JBK to sell to WCK is clear from the facts. It is doubtful that either knew in advance that the November 16, 1978 transactions were to be effected. The account executives of Hutton involved in the transactions did not plan to execute a cross-trade and did not even have knowledge of it until long after the fact. From the standpoint *251 of the policy underlying section 267, this was clearly not a transaction or series of transactions designed to create tax losses between members of a family without any significant economic effect on the family investments. McWilliams v. Commissioner,supra.That the November 16, 1978 transaction involved identical futures contracts was simply a coincidence, resulting from the trading patterns developed by Hutton to accomplish the tax straddle objectives. Moreover, the fact of a cross trade in this context is immaterial. If McWilliams applied, it would apply to all trades wherer or not crossed, where one member of a family disposes of a position and another member acquires the same position. Moreover, as the McWilliams court recognizes, there is no safe harbor time interval specified in the statute as there is in the wash sale provision. [16] Respondent does not, however, argue for such treatment. As we have found, the acquisiton of a 260 December 1979 long gold position by JBK and later by WCK was in each case intended when acquired to be disposed of in order to realize the tax losses in issue in this case. True, tax losses *252 were involved. But it is merely a coincidence that losses, which under Smith and Fox would clearly be disallowed, happened to be subject to a section 267 argument. We cannot extend the scope of section 267 by eliminating the element of prearrangement from an indirect sale or exchange in order to erode the scope of section 108 as interpreted in Miller v. Commissioner,supra.
This is simply not a situation where either Brother had any interest in or even beforehand knowledge of his "investment" in 260 December 1979 long gold futures. Neither Brother acquired this position with any intent of retaining it. It was not a family investment. For each Brother, acquisition of this commodity futures contract was merely a mechanical step in the achievement of tax straddle losses. The fact that the same position was recommended by Sawyer for each Brother reflected merely that it was a convenient transaction, which in the overall tax straddle scheme would produce the intended result with hopefully a minimum loss potential. We do not think Congress, or the McWilliams court, intended that family members operating independently and without prearrangement should *253 have to be concerned about section 267, especially when the length of time between transactions is immaterial for section 267 purposes. Shether v. Commissioner,28 T.C. 1222 (1957). See, e.g., Federal Cement Tile Co. v. Commissioner,40 T.C. 1028 (1963), affd. 338 F.2d 691 (7th Cir. 1964); Boehm v. Commissioner,28 T.C. 407 (1957), affd. 255 F.2d 684 (2d Cir. 1958); McNeill v. Commissioner,27 T.C. 899 (1957), revd. on another issue 251 F.2d 863 (4th Cir. 1958). We said in Shethar v. Commissioner,supra:
If section 24(b)(1)(A) is to accomplish its purpose, indirect sales cannot be limited to a fixed number of known methods of creating losses. The problem in this case is whether the purchase by one spouse was so related to the sale by the other spouse that the loss from the latter must be disallowed because it resulted from an indirect sale by one spouse to the other. In this case husband and wife cooperated in the development and execution of a plan designed to create losses deductible for tax purposes and at the same time preserve the family *254 position in the various securities that were to be sold to create the losses. [Emphasis supplied.] [28 T.C. at 1227.] For the foregoing reasons, we hold that section 267 does not apply to prevent JBK from deducting the loss which arose out of the November 16, 1978 transaction. Consequently we hold for pertitioners James B. Kurtz and wife on the section 267 issue. Decision will be entered for the petitioners in each docket.
Appendix A CHART I JAMES B. KURTZ GOLD COMMODITY TRANSACTIONS 1978 THROUGH 1979
Current
CONTRACTS
Balance
Dec 79
Feb 80
Apr 80
June 80
Long/(Short)
1978 Transactions
Initial Transaction
11-13-78
Trade
260 (260)
Position
260 (260)
260/(260)
First Transaction
11-16-78
Trade
(260)
260 Position
0
260 (260)
260/(260)
Second Transaction
12-27-78
Trade
260 (260)
Position
0
260 0
(260)
260/(260)
1979 Transactions
Third Transaction
2-14-79
Trade
(130)
130 Position
0
130 0
(130)
130/130 Final Transaction
5-18-79
Trade
(130)
130 0/00   Position
0
0
0
0
Calculated
Gain (Loss)
Unrealized
Unrealized
Claimed on
Gain (Loss)
Gain (Loss)
Net Equity
Tax Return
Date
in Acct
in Acct
[1]
[2]
1978 Transactions
Initial Transaction
11-13-78
Trade
Position
N/A
11-13-78
(5,200)
(20,280)
First Transaction
11-16-78
Trade
Position
(480,740)
(480,740)
11-16-78
481.000 (14,820)
Second Transaction
12-27-78
Trade
Position
(257,140)
(737,880)
12-27-78
735,800 (17,160)
1979 Transactions
Third Transaction
2-14-79
Trade
Position
349,960 (387,920)
2-14-78
361,400 (34,060)
Final Transaction
5-18-79
Trade
347,360 Position
[3] (40,560)
0
[3] (40,560)
*255 CHART II JAMES B. KURTZ SILVER COMMODITY TRANSACTIONS 1978 THROUGH 1979
Current
CONTRACTS
Balance
Sept 79
Dec 79
Jan 80
Mar 80
Long/(Short)
1978 Transactions
Initial Transaction
11-13-78
Trade
(210)
210 Position
(210)
210 210-(210)
First Transaction
11-22-78
Trade
210 (150)
(60)
Position
0
(150)
210 (60)
210-(210)
1979 Transactions
Final Transaction
5-18-79
Trade
150 (210)
60 Position
0
0
0
0
0/0   Calculated
Gain (Loss)
Unrealized
Unrealized
Claimed on
Gain (Loss)
Gain (Loss)
Net Equity
Tax Return
Date
in Acct
in Acct
[1]
[2]
1978 Transactions
Initial Transaction
11-13-78
Trade
Position
N/A
11-13-78
(2,100)
(9,450)
First Transaction
11-22-78
Trade
Position
(213,675)
(213,675)
11-22-78
169,200
(51,825)
1979 Transactions
Final Transaction
5-18-79
Trade
Position
162,600 5-18-79
[3] (51,075)
[3] (51,075)
*256 CHART III W. C. KURTZ, JR. COLD COMMODITY TRANSACTIONS 1978 THROUGH 1979
Current
CONTRACTS
Balance
Oct 79
Dec 79
Feb 80
Apr 80
Long/(Short)
1978 Transactions
Initial Transaction
11-13-78
Trade
260 (260)
Position
260 (260)
260-(260)
First Transaction
11-16-78
Trade
(260)
260 Position
0
260 (260)
260-(260)
Second Transaction
12-20-78
Trade
260 (260)
260-(260)
Position
0
260 0
(260)
260-(260)
Third Transaction
12-27-78
Trade
(260)
260 Position
0
260 (260)
0
1979 Transactions
Fourth Transaction
2-14-79
Trade
(130)
130 Position
0
130 (130)
0
130-(130)
Final Transaction
5-18-79
Trade
(130)
130 Position
0
0
0
0
0/0
Calculated
Gain (Loss)
Unrealized
Unrealized
Claimed on
Gain (Loss)
Gain (Loss)
Net Equity
Tax Return
Date
in Acct
in Acct
[1]
[2]
1978 Transactions
Initial Transaction
11-13-78
Trade
Position
N/A
11-13-78
(2,600)
(17,680)
First Transaction
11-16-78
Trade
Position
(405,340)
(405,340)
11-16-78
403,000 (17,420)
Second Transaction
12-20-78
Trade
Position
(132,340)
(537,680)
12-20-78
538,200 (14,560)
Third Transaction
12-27-78
Trade
Position
(218,200)
(755,880)
12-27-78
733,200 (37,760)
1979 Transactions
Fourth Transaction
2-14-79
Trade
353,860 Position
(402,020)
2-14-79
364,000 (45,560)
Final Transaction
5-18-79
Trade
352,560 Position
[3] (49,460)
[3] (49,460)
*257 CHART IV W. C. KURTZ, JR. SILVER COMMODITY FRANSACTIONS 1978 THROUGH 1979
Current
CONTRACTS
Balance
Dec 79
Jan 80
Mar 80
May 80
Long/(Short)
1978 Transactions
Initial Transaction
11-13-78
Trade
(210)
210 Position
(210)
210 210-(210)
First Transaction
11/22/78
Trade
210 (100)
(110)
Position
0 (100)
210 (110)
210-(210)
1979 Transactions
Final Transaction
5/18/79
Trade
100 (210)
110 Position
0
0
0
0
0/0   Calculated
Gain (Loss)
Unrealized
Unrealized
Claimed on
Gain (Loss)
Gain (Loss)
Net Equity
Tax Return
Date
in Acct
in Acct
1978 Transactions
Initial Transaction
[2]
11-13-78
Trade
Position
N/A
(3,150)
(10,500)
First Transaction
11/22/78
Trade
Position
(180,125)
11-22-78
150,100 (37,375)
(180,125)
1979 Transactions
Final Transaction
5/18/79
Trade
Position
139,050 [1] (41,075)
[1] (41,075)
*258 Footnotes
*. An amicus curiae brief and reply brief were filed by William F. Nelson, William S. McKee, and David W. Mills on behalf of Dorchester Partners.↩
1. Through the use of commodities futures straddles it is possible to realize tax losses by making switches, which losses may be used to offset capital gains realized in unrelated transactions, and to realize capital gains in a succeeding year on final close out of the straddles. The mechanics of commodity futures trading are discussed in detail in Smith v. Commissioner,78 T.C. 350↩ (1982). 2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Use of tax straddles had the potential of deferring some part of the larger capital gain realized by the Brothers on sale of their interest in the family business to 1979 which would allow them to take advantage of the substantial reduction in capital gains tax rate applicable to the later year.↩
4. The testimony of the Brothers and their witnesses in this case reflects that they were all well aware of the need to emphasize their profit objective in order to attempt to avoid the result in Smith v. Commissioner,supra.↩
5. The testimony of the Hutton employees is in conflict. They stated that these percentages were to be applied against the tax loss goal of $1,000,000 of realized losses, not the margin deposit. It is unnecessary to resolve this conflict.↩
6. In a nondiscretionary account, trades can be effected by the broker only as directed by the customer whereas as in a discretionary account the customer gives to the broker the power to make trading decisions. All of the parties involved, with the possible exception of Sawyer, appear to have treated the accounts as though Tamplin held a power of attorney to act for the Brothers. The Brothers do not appear to have exercised any decision making power with respect to specific trades. They did, of course, knowingly embark on the program and direct its termination.↩
7. In each case we treat the disposition on Feb. 22, 1979 of one-half of the gold positions as creating a new gold straddle, although it is unclear that such characterization would be appropriate in the commodities industry. It makes no material difference in this case.↩
8. We have taken judicial notice of the by-laws, rules, and regulations of COMEX, the by-laws of the COMEX Clearing Association, Inc., as well as the provisions of the Commodity Futures Trading Commission Act of 1974, Pub.L. 93-463, 88 Stat. 1389; and the regulations of the Commodity Futures Trading Commission, 17 CFR 1.1 et. seq. (1984)↩. See also, Vernon, "Regulation of Commodities Futures Trading: A Basic Primer," 5 Journal of Agricultural Taxation & Law 125 (1983); and Fishman, "Commodities Futures: An Introduction for Lawyers," 65 Chicago Bar Record 306 (1984). 9. For example, the position acquired for JBK on November 13, 1978 of 260 December 1979 long gold was matched by one or more other orders aggregating 260 December 1979 short gold.↩
10. This legitimate cross-trade practice is to be distinguished from a matching of trades outside the floor of the exchange which is illegal although it may occur.↩
11. The testimony as to this exhibit is very sketchy and the exhibit is not understandable, at least to a person who is not intimately familiar with the mechanics of floor trading.↩
12. Division A of the Deficit Reduction Act of 1984, 98 Stat. 494.↩
13. Economic Recovery Act of 1981, Pub. L. 97-34, 95 Stat. 172.↩
14. This issue was not raised by any pleading but was tried at the insistence of respondent without objection by petitioners. The burden of proof is thus upon respondent although neither party has commented on this fact and petitioners do not argue that respondent has not discharged his burden. This issue is largely a legal one.↩
15. We have held that the netting or closing out of a commodities futures position by acquiring the mirror image is a capital transaction treated as a sale or exchange for tax purposes. See Covington v. Commissioner,42 BTA 601 (1940), affd. on this issue 120 F.2d 768 (5th Cir. 1941), cert. denied 315 U.S. 822 (1942). In our recent opinion in Vickers v. Commissioner,80 T.C. 394 (1983), we held that "in economic reality" the first trader has sold his position to the second trader. We did not, however, in that case have before us the trader. We did not, however, in that case have before us the question of whether section 267 would apply. We recognized in Vickers,↩ as we do here, that there is no direct transaction between the two investors.
16. See Section 1091.↩
1. Amounts agree to E. F. Hutton Statements - include commissions and fees incurred. ↩
2. This equity includes commissions and fees that would be charged to close the contracts remaining. ↩
3. Represents total cash lost on trades - includes commissions and fees of $30,160.↩
1. Includes commissions and fees - agrees to EF Hutton statements. ↩
2. Include commissions and fees incurred to close contract. ↩
3. This represents actual cash lost on trades including commissions and fees of $11,025.↩
1. These amounts include commissions and fees - Total = $37,760 - Loss due to change in market =$11,780 ↩
2. Includes commissions and fees required to close remaining positions. ↩
3. Total loss on gold commodity includes commissions and fees. ↩
2. Equity computed with fees and Com required to close positions.↩
1. Total amount of Cash on Silver Trades - Includes $11,025 in Commissions and Fees Paid. ↩